FILED

JUN – 2 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS – SAN ANTONIO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>THE STATE OF TEXAS,<br>THE STATE OF FLORIDA, AND<br>THE STATE OF NEW MEXICO,<br>*ex rel.*, [UNDER SEAL]<br><br>RELATOR,<br><br>v.<br><br>[UNDER SEAL]<br><br>DEFENDANTS | CAUSE NO. **SA20CA0661 JKP**<br><br>COMPLAINT<br><br>FILED IN CAMERA AND UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## DOCUMENT TO BE KEPT UNDER SEAL
## DO NOT ENTER ON PACER

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS – SAN ANTONIO DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>THE STATE OF TEXAS,<br>THE STATE OF FLORIDA, &<br>THE STATE OF NEW MEXICO,<br>*ex rel.,* MATTHEW ANDREW GARCES<br><br>RELATOR,<br><br>v.<br><br>UNITED HEALTHCARE SERVICES, INC.,<br>OPTUM CARE, INC.,<br>WELLMED MEDICAL MANAGEMENT, INC.,<br>WELLMED MEDICAL GROUP, P.A., &<br>EPISOURCE, LLC<br><br>DEFENDANTS | CAUSE NO. <br> SA20CA0661 JKP<br>COMPLAINT<br><br>FILED IN CAMERA AND UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>FILED<br>JUN – 2 2020<br>CLERK, U.S. DISTRICT COURT<br>WESTERN DISTRICT OF TEXAS<br>BY_____<br>DEPUTY CLERK |

## COMPLAINT

COMES NOW, Relator Matthew Andrew Garces ("Relator"), by and through the undersigned counsel, brings this *Qui Tam* Complaint on behalf of the United States of America, the State of Texas, the State of Florida, and the State of New Mexico (collectively, the "Government"), against Defendants United Healthcare Services, Inc., a Minnesota corporation, Optum Care, Inc., a Delaware corporation, WellMed Medical Management, Inc., a Texas corporation, WellMed Medical Group, P.A., a Texas professional association, and Episource, LLC, a California corporation (collectively referred to as "Defendants") to recover civil penalties and treble damages under the False Claims Act (the "FCA"; 31 U.S.C. § 3729-33), the Texas Medicaid Fraud Prevention Act ( the "TMFPA"; Texas Human Resources Code § 36.001 *et seq.*), the Florida False Claims Act (the "FFCA"; Florida Statute § 68.081 *et seq*), and the New Mexico Medicaid False Claims Act (the "NMMFCA"; New Mexico Statute § 27-14-1 *et* seq; collectively

with the FCA, TMFPA, and FFCA the "False Claim Acts"). This Complaint incorporates evidence contained in the exhibits provided to the Government in satisfaction of 31 U.S.C. § 3730(b)(2) of the FCA, § 36.102(a) of the TMFPA, § 68.083(3) of the FFCA, and §27-14-7(C) of the NMMFCA, which are being provided contemporaneously with the filing of this Complaint.

## I.
## INTRODUCTION

1.      This is an action to recover civil penalties and treble damages, on behalf of the Government, arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the False Claim Acts.

2.      This *qui tam* case is brought against Defendant for knowingly defrauding the Government by submitting and/or causing the submission of false claims for reimbursement to Medicare, 42 U.S.C. § 1395 *et seq.*, and Medicaid, 42 U.S.C. § 1396 *et seq.*, in violation of the False Claim Acts. As alleged below, for at least the past year and a half, Defendants have knowingly engaged in an improper billing process and procedure that resulted in the systematic violation of the FCA, TMFPA, FFCA and NMMFCA.

## II.
## JURISDICTION

3.      The Court has subject matter jurisdiction over this *qui tam* action pursuant to 31 U.S.C. §§ 3730 and 3732 and 28 U.S.C. § 1331. The Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a).

### III.
### VENUE

4.     Venue in this *qui tam* action is proper pursuant to 31 U.S.C. § 3732(a) as at least one defendant resides in this district, and acts proscribed by 31 U.S.C. § 3729 occurred, at least in part, in this district.

### IV.
### PARTIES

5.     Relator Matthew Andrew Garces is a citizen of the United States, residing in San Antonio, Texas. As required by False Claim Acts, Relator has provided the Attorney General of the United States and the United States Attorney for the Western District of Texas as well as the attorney general offices of Texas, Florida, and New Mexico, contemporaneously with the filing of this Complaint, a statement of all material evidence and information related to the Complaint.

6.     Relator brings this action on behalf of the Government. Relator is the "original source" of the information upon which this action is based with the meaning of 31 U.S.C. § 3730(e)(4)(B).

7.     Relator is a registered nurse and was a Senior Clinical Coding Nurse Consultant for WellMed Medical Management, Inc.

8.     Defendant United Healthcare Services, Inc. ("United") is a foreign corporation registered to perform business in Texas and incorporated under the laws of Minnesota. United is Optum Care, Inc.'s parent company. United may be served with process by and through its Texas registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

9.     Defendant Optum Care, Inc. ("Optum") is a foreign corporation registered to perform business in Texas and incorporated under the laws of Delaware. Optum

purchased Defendant WellMed Medical Management, Inc., in 2011. Optum may be served with process by and through its Texas registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

10.     Defendant     WellMed     Medical     Management,     Inc.,     ("WellMed Management") is a Texas corporation domiciled in San Antonio, Texas that owns and operates WellMed clinics in Texas, Florida, and New Mexico. Additionally, WellMed Management also manages the submission of insurance payments and claims for reimbursements to the Centers for Medicare and Medicaid Services ("CMS") for both WellMed-owned clinics as well as Defendant WellMed Medical Group, P.A.. WellMed Management may be served with process by and through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201

11.     Defendant WellMed Medical Group, P.A., ("WellMed Medical Group"; together with WellMed Management, "WellMed") is a Texas professional association made up of physicians responsible for the care and treatment of patients within WellMed facilities across Texas, Florida, and New Mexico. WellMed Medical Group may be served with process by and through its registered agent CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

12.     Defendant Episource, LLC ("Episource") is a California limited liability company with its principal place of business in Gardena, California. Defendants United, Optum, WellMed Management, and WellMed Medical Group engaged Episource to provide medical record retrieval and auditing services to WellMed wherein Episource would audit the same to specifically increase the input of CPT codes entitling WellMed to unearned risk adjustment payments. Episource may be served with process by and

through its California registered agent Sishir Reddy at 500 West 190th Street, 4th Floor, Gardena, California 90248.

## V.
## APPLICABLE STATUTES AND PROGRAMS

### A. THE FEDERAL FALSE CLAIMS ACT.

13.    The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the United States is liable for damages in the amount of three (3) times the amount of loss the government sustained, and penalties which range between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

14.    For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Proof of specific intent to defraud is not required under the FCA. *Id.*

### B. TEXAS MEDICAID FRAUD PREVENTION ACT.

15.    The Texas Medicaid Fraud Prevention Act prohibits false claims for Medicaid reimbursement. Under Texas Human Resources Code § 36.002, a person commits an unlawful act if the person:

> (1) knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized (§ 36.002(1));

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized (§ 36.002(2));

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received (§ 36.002(3)); and

(4) knowingly engages in conduct that constitutes a violation under Section 32.039(b) (§ 36.002(13)).

## C.  FLORIDA FALSE CLAIMS ACT.

16.     The Florida False Claims Act prohibits false claims for Medicaid reimbursement. Under Florida Statute § 68.082(2), a person commits an unlawful act if the person:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval (§ 68.082(2)(a));

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim (§ 68.082(2)(a)); and

(3) Conspires to commit a violation of the Florida False Claims Act (§ 68.082(2)(a)).

#### D. New Mexico Medicaid False Claims Act.

17.     The New Mexico Medicaid False Claims Act prohibits false claims for Medicaid reimbursement. Under New Mexico Statute § 27-14-4, a person commits an unlawful act if the person:

> (1) Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent (§ 27-14-4(A));

> (2) Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program (§ 27-14-4(B));

> (3) Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false (§ 27-14-4(C)); and

> (4) Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent (§ 27-14-4(D)).

#### E. Medicare Background.

18.     Medicare is a federal healthcare program created in 1965 with the passage of the Social Security Amendments to ensure that citizens 65 and older as well as younger persons with certain disabilities have access to quality healthcare. Medicare is administered by the Department of Health and Human Services ("DHHS") through the Centers for Medicare and Medicaid Services ("CMS"). CMS manages Medicare

programs by selecting official Medicare administrative contractors ("MACs") to process the Medicare claims associated with various parts of Medicare. Medicare as a healthcare plan is divided into different parts, each of which cover a specific healthcare service

19.     Medicare Part A covers basic healthcare necessary to treat a pressing medical condition. Covered services may include hospital care, skilled nursing care, nursing home care, hospice care, and other support deemed essential to treating an illness or a condition.

20.     Medicare Part B covers services or supplies needed to treat or prevent a medical condition. Part B of Medicare also covers some preventive care services such as inpatient/outpatient mental health, clinical research, and ambulance services.

21.     Medicare Part C covers all healthcare services through a provider organization such as a hospital or a private practice. Patients must be enrolled in Medicare Parts A and B to qualify for Part C.

22.     Medicare Part D was created in 2003 with the passage of the Medicare Prescription Drug, Improvement, and Modernization Act. It covers many prescription drug costs and is paid for by monthly premiums of Medicare enrollees.

**F.  MEDICAID BACKGROUND.**

23.     Medicaid is a program that provides healthcare coverage for low-income families and individuals, for persons with disabilities, and in some cases the elderly. For medical billing purposes, the most important difference between Medicare and Medicaid is the organization of each program. Medicare is a program provided by the federal government through CMS and has universal applications across state boundaries. Medicaid is a program funded by both state governments and the federal government.

States provide Medicaid benefits in cooperation with CMS and federal guidelines. Medicaid programs differ from state to state, though they must all meet certain standards established by the federal government.

24.     Medicaid coverage plans can change from state to state. Some states have extended their Medicaid programs to cover comprehensive healthcare issues for recipients, while other states only meet the minimum program requirements as mandated by the federal government. The following are some of the minimum Medicaid services covered: inpatient/outpatient hospital services; family planning care; pediatric services; prescription drug costs; dental healthcare and services; mental health services; and occupational, physical, and speech therapy.

## VI.
## MEDICAL BILLING PROCESS

### A. CREATION OF MEDICAL RECORDS.

25.     If a healthcare provider wishes to participate in Medicare or Medicaid, it must comply with the standards and certificates set forth in 42 C.F.R. § 482 ("§482"), which (in relevant part) requires that "[a]ll patient medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures." 42 C.F.R. § 482.24(c)(1) (emphasis added).

26.     Additionally, "[a]ll orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with state law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." *Id.* at § 482.24(c)(2). The requirements of §482 are vital

as medical records created by the providing or evaluating practitioner begin the medical billing process.

## B. APPLICATION OF CURRENT PROCEDURAL TERMINOLOGY CODES.

27.     Traditionally, healthcare providers employ billing departments to convert a patient's medical chart into a claim that itemizes the appropriate Current Procedural Terminology Codes ("CPT Codes" or "Billing Codes") associated with the treatment provided to the patient. Medicare/Medicaid then uses the Billing Codes submitted on the claim to determine the level of reimbursement for those Billing Codes, and ultimately, pays the healthcare provider for the services it rendered to the patient.

28.     Billing Codes are established each year by the American Medical Association ("AMA"). The AMA publishes a book containing the CPT Codes, with each code containing five digits. The CPT Code first appeared in 1966 and acts as a dictionary, defining the service performed by the physician that is billed with each five-digit code. This definition, to which the 5-digit numerical code is assigned, is known as a "descriptor."

29.     When billing Medicare or Medicaid a particular CPT Code, the practitioner and/or hospital is attesting to fact that the service described in the descriptor of the code billed was performed, and that he/she/it is entitled to the reimbursement for that particular code.

30.     Healthcare providers are very familiar with CPT Codes, their descriptors, and the amount of reimbursement Medicare/Medicaid pays for each code. Some hospitals and billing companies structure their coding to improperly maximize reimbursement by billing CPT Codes which were either not performed at all, or which do not accurately

represent the services which were performed, or which were not medically necessary, or which are bundled into other services, or which are not adequately/properly documented to evidence that the service was performed. Presently, Defendants improperly structure their coding to ensure that a patient is categorized into a "High Risk" class, thereby entitling them to a higher risk adjustment reimbursement rates from Medicare/Medicaid.

31.    Coding of this sort, when performed with actual knowledge, deliberate ignorance, or with reckless disregard constitutes an actionable false claim under the False Claim Acts.

### C. PAYMENT OF RISK ADJUSTMENT REIMBURSEMENTS FOR THE NEXT CALENDAR YEAR BASED ON PRECEDING YEAR PATIENT DIAGNOSES.

32.    Risk adjustment payments are awarded to physicians upon providing CPT Codes coupled with medical documentation that a patient has a chronic condition (*i.e.,* chronic kidney disease, diabetes, etc.). The purpose of risk adjustment payments is two-fold: 1) to preemptively award physicians with treatment charges for the next calendar year for the treatment of the patient's chronic condition that will more often than not be treated during and in addition to other typical medical appointments; and 2) to ensure physicians are not turning patients away for basic care because the physician felt they were not being paid for their services to treat the chronic condition in addition to or at the same time as ordinary patient care.

33.    In order for physicians to receive risk adjustment payments, they must document the chronic condition with the corresponding CPT Code. A chronic condition cannot be coded using the risk adjustment payment CPT Code without proper documentation that the patient has a chronic condition.

34.     Acceptable practices for proper documentation to justify the entering of a risk adjustment CPT Code include documentation that supports the physician monitored, evaluated, assessed or treated the patient for the chronic condition sometime during the previous calendar year.

35.     Failure to adjust submissions of CPT Codes for risk adjustment payments for which appropriate medical documentation does not exist constitutes an actionable false claim under the FCA, TMFPA, FFCA and NMMFCA.

### D.  AUDITING OF MEDICAL RECORDS.

36.     As a safeguard to ensure proper medical billing, healthcare providers employ billing departments, often comprised of nurses and physicians who are familiar with both the treatment of patients as well as the billing codes to be employed for such treatment. Additionally, billing departments include individuals tasked with auditing the associated Billing Codes generated through the billing department ("Auditing Teams" or "Auditing Department").

37.     If the Auditing Department identifies any discrepancies (i.e., missing or improper information), the records must be sent back to the treating or evaluating practitioner to be modified and properly notated, as required by applicable hospital policy and §482. Additionally, Auditing Teams review the CPT Codes generated by the billing department to ensure the medical records adequately and legitimately support the claim to be submitted to Medicare/Medicaid. Essentially, Auditing Teams are tasked with ensuring that the treatment provided to a patient and the associated Billing Codes are valid and proper prior to a claim being submitted to Medicare or Medicaid.

38.    Alternatively, healthcare providers may outsource the auditing of their claims to third parties, like Episource, which utilizes medical billing auditing teams based in the Philippines to provide medical record retrieval and auditing services to WellMed. Episource retrieves a patient's medical records manually or electronically and audits those documents for risk adjustment Billing Codes for the purpose of submitting those codes to Medicare/Medicaid for increased risk adjustment reimbursement payments.

## VII.
## OPERATIVE FACTS

39.    Defendants have overbilled Medicare/Medicaid, and failed to report such overpayments, since at least August 2019—when Relator became Senior Clinical Coding Nurse and Consultant for WellMed Management. Defendants' billing departments deceptively insert Billing Codes associated with chronic diseases, without the required supporting documentation, in order to entitle Defendants to risk adjustment payments. Namely, Defendants routinely insert a CPT Code associated with a chronic illness on a claim if they see that a medication used in the treatment of a chronic illness was prescribed to a patient despite the fact that the treating physician did not enter such a diagnosis in the patient's medical records.

40.    Accordingly, Defendants submit false claims to Medicare/Medicaid by submitting claims that state a patient has been diagnosed with a chronic disease when he/she was not so diagnosed in order to improperly receive risk adjustment payments. Even more, Defendants' fail to correct their misdiagnoses and fail to report the overpayments to Medicare/Medicaid once a misdiagnosis is brought to their attention by a third-party.

## VIII.
## EVIDENCE OF MEDICARE/MEDICAID FRAUD

41.    Relator observed the following examples of billing and medical deficiencies while working as a Senior Clinical Coding Nurse and Consultant. While many additional audit/billing deficiencies were identified before, during, and after Relator's employment, this cross-section is provided to exemplify the kind of deficiencies Relator personally observed which indicate Defendants are improperly collecting funds from Medicare/Medicaid on the basis of inadequately documented records or on the basis of inappropriate augmentation of medical records.

42.    The examples provided are categorized into two basic groups: (1) examples of Defendants approving of diagnoses that patients ultimately did not have that fraudulently qualified Defendants for risk adjustment payments; and (2) examples of Defendant's failure to provide adequate auditing to correct illegitimate diagnoses that fraudulently qualified Defendants for risk adjustment payments from CMS.

A. EXAMPLE OF DEFENDANT'S FAILURE TO PROVIDE ADEQUATE MEDICAL RECORDS TO SUPPORT SUBMISSION FOR RISK ADJUSTMENT PAYMENTS.

43.    **Patient VG:** Patient VG was treated on June 12, 2018, whereafter Episource auditor Poorva Narasimhan entered a diagnosis of Chronic Systolic (Congestive) Heart Failure (CPT Code I50.22) without any documentation supporting such diagnosis by the treating physician. Ultimately, well after CPT Code 150.22 was assigned, Patient VG was diagnosed by Dr. Nicolas Walsh with Takotsubo Cardiomyopathy (also known as "Broken Heart Syndrome"; a heart condition involving a weakening of the left ventricle due to extreme stress) on February 21, 2019, which is reflected by the submission of CPT Code I51.81. Thus, CPT Code I50.22 was submitted

to Medicare for a risk adjustment payment for 2018 in error. As such, Defendants submitted a false claim to the Government and improperly failed to correct or report/repay the overpayments they received.

B. EXAMPLE OF DEFENDANT'S FAILURE TO PROVIDE ADEQUATE AUDITING TO CORRECT ILLEGITIMATE DIAGNOSES OF PATIENTS FRAUDULENTLY QUALIFYING DEFENDANTS FOR RISK ADJUSTMENT PAYMENTS

44.    **Patient SB**: Patient SB was misdiagnosed with Type 2 Diabetes with Diabetic Chronic Kidney Disease (CPT Code E11.22) for date of service November 8, 2018 and date of service April 4, 2019. The sole source of supportive documentation used by Episource auditors for the entry and submission of this diagnoses was patient's past medical history with a diuretic medication.

45.    Additionally, due to being misdiagnosed with Type 2 Diabetes with Diabetic Chronic Kidney Disease, Patient SB was also misdiagnosed with Chronic Kidney Disease Stage 2 (Mild) on November 8, 2018 and April 4, 2019. These are not acceptable coding practices according to Medicare guidelines. In fact, Patient SB's primary care physician also disagreed with the diagnoses on an attestation form which is a means of communication between the patient's healthcare provider and the medical coder/auditor. Nevertheless, Defendants submitted the fraudulent claim to the Government in order to receive risk adjustment payments.

46.    Relator alleges that these examples are demonstrative of a much larger pool of claims submitted to CMS by Defendants with the intent to receive risk adjustment payments for which Defendants do not have proper medical documentation. Although narrow in scope here due to Relator's limited exposure to claims only submitted for audit,

it is reasonably believed that the true number of fraudulent claims is significant in nature and harmful to the Government on an exponential level.

## IX.
## CAUSES OF ACTION

### COUNT ONE
**(Violation of 31 U.S.C. § 3729(a)(1)(A))**
***(Against Defendants WellMed Medical Group and WellMed Management)***

47.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-45 above, as set forth fully herein.

48.     By virtue of the acts described above, Defendants WellMed Medical Group and WellMed Management knowingly presented, or caused to be presented to officers, employees, or agents of the Government, false or fraudulent claims for payment or approval. Defendants WellMed Medical Group and WellMed Management knew that these claims for payment were false, fraudulent or fictitious, or were deliberately ignorant of the truth or falsity of said claims or acted in reckless disregard of whether said claims were true or false. These claims were therefore false or fraudulent claims for payment or approval for payment to the Government in violation of 31 U.S.C. §3729(a)(1)(A).

49.     Plaintiff, the United States, being unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payment to Defendants.

50.     By reason of these actions, the Government has been damaged in the amount to be determined at trial, plus a civil penalty for each violation.

### COUNT TWO
**(Violation of 31 U.S.C. § 3729(a)(1)(B))**
***(Against Defendants WellMed Medical Group and WellMed Management)***

51.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-49 above, as set forth fully herein.

52.     By virtue of said acts described above, Defendants WellMed Medical Group and WellMed Management knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims allowed or paid to Defendants WellMed Medical Group and WellMed Management by the Medicare program, in violation of 31 U.S.C. § 3729(a)(1)(B).

53.     Defendants WellMed Medical Group and WellMed Management had actual knowledge that their claims for Medicare reimbursement, which were based upon allowable costs, were false, or they were deliberately ignorant of and acted in reckless disregard of the fact that such claims were false, in violation of 31 U.S.C. § 3729(a)(1)(B).

54.     Plaintiff, the United States, unaware of this falsity of the records and/or statements made, used, or caused to be made and used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted to it.

55.     By reason of these actions, the Government has been damaged in an amount to be determined at trial, plus a civil penalty for each violation.

### COUNT THREE
### (Violation of 31 U.S.C. § 3729(a)(1)(C))
### *(Against All Defendants)*

56.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-54 above, as set forth fully herein.

57.     Defendants entered into a conspiracy or conspiracies amongst each other, and with others both known and unknown, to defraud the Government by getting false or

fraudulent claims allowed or paid to Defendants in violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B) and committed one or more overt acts in furtherance of said conspiracy or conspiracies, all in violation of 31 U.S.C. § 3729(a)(1)(C).

58.     Plaintiff, the United States, unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false and fraudulent claims, made payment to Defendants resulting in the Government being damaged in an amount to be determined at trial, plus a civil penalty for each violation.

### COUNT FOUR
### (Violation of TEX. HUM. RES. CODE. §§ 36.002(1), (2), & (9))
### (*Against WellMed Medical Group and WellMed Management*)

59.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-57 above, as set forth fully herein.

60.     At all times relevant to this action, Defendants WellMed Medical Group and WellMed Management were legally obligated to only seek reimbursement for services provided to Medicaid patients if they complied with applicable federal and Texas law.

61.     Defendants WellMed Medical Group and WellMed Management knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of Texas, including those claims for reimbursement for services provided in violation of, *inter alia*, Texas Human Resources Code § 36.002(1), (2), and (13).

62.     Defendants WellMed Medical Group and WellMed Management presented these claims with actual knowledge of the falsity of the information, acted in

deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

## COUNT FIVE
### (Violation of TEX. HUM. RES. CODE. §§ 36.002 (13))
### (*Against All Defendants*)

63.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-61 above, as set forth fully herein

64.     Defendants entered into a conspiracy or conspiracies amongst each other, and with others both known and unknown, to violate applicable Texas law, and committed one or more overt acts in furtherance of said conspiracy or conspiracies, in violation of TEX. HUM. RES. CODE § 36.002(13).

65.     As a result of the false and fraudulent claims Defendants made, the State of Texas has suffered damages and therefore is entitled to recovery as provided by the Texas Medicaid Fraud Prevention Act in an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT SIX
### (Violation of Florida Statute §§ 68.082(2)(a-b))
### (*Against WellMed Medical Group and WellMed Management*)

66.     Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-64 above, as set forth fully herein.

67.     At all times relevant to this action, Defendants WellMed Medical Group and WellMed Management were legally obligated to only seek reimbursement for services provided to Medicaid patients if they complied with applicable federal and Florida law.

68.     Defendants WellMed Medical Group and WellMed Management knowingly presented, or caused to be presented, false and fraudulent claims for payment

or approval to the State of Florida, including those claims for reimbursement for services

provided in violation of, *inter alia*, Florida Statute § 68.082(2)(a-b).

69.    Defendants WellMed Medical Group and WellMed Management

presented these claims with actual knowledge of the falsity of the information, acted in

deliberate ignorance of the truth or falsity of the information, or acted in reckless

disregard of the truth or falsity of the information.

**COUNT SEVEN**
**(Violation of Florida Statute § 68.082(2)(c))**
***(Against All Defendants)***

70.    Relator re-alleges and incorporates by reference each of the allegations

contained in paragraphs 1-68 above, as set forth fully herein

71.    Defendants entered into a conspiracy or conspiracies amongst each other,

and with others both known and unknown, to violate applicable Florida law, and

committed one or more overt acts in furtherance of said conspiracy or conspiracies, in

violation of Florida Statute § 68.082(2)(c).

72.    As a result of the false and fraudulent claims Defendants made, the State

of Florida has suffered damages and therefore is entitled to recovery as provided by the

Florida False Claims Act in an amount to be determined at trial, plus a civil penalty for

each violation.

**COUNT EIGHT**
**(Violation of New Mexico Statute §§ 27-14-4(A-C))**
***(Against WellMed Medical Group and WellMed Management)***

73.    Relator re-alleges and incorporates by reference each of the allegations

contained in paragraphs 1-71 above, as set forth fully herein.

74.    At all times relevant to this action, Defendants WellMed Medical Group

and WellMed Management were legally obligated to only seek reimbursement for

services provided to Medicaid patients if they complied with applicable federal and New Mexico law.

75.    Defendants WellMed Medical Group and WellMed Management knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of Florida, including those claims for reimbursement for services provided in violation of, *inter alia*, New Mexico Statute §§ 27-14-4(A-C).

76.    Defendants WellMed Medical Group and WellMed Management presented these claims with actual knowledge of the falsity of the information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

### COUNT NINE
### (Violation of New Mexico Statute §§ 27-14-4(D))
### (*Against All Defendants*)

77.    Relator re-alleges and incorporates by reference each of the allegations contained in paragraphs 1-75 above, as set forth fully herein

78.    Defendants entered into a conspiracy or conspiracies amongst each other, and with others both known and unknown, to violate applicable Florida law, and committed one or more overt acts in furtherance of said conspiracy or conspiracies, in violation of New Mexico Statute § 27-14-4(D).

79.    As a result of the false and fraudulent claims Defendants made, the State of New Mexico has suffered damages and therefore is entitled to recovery as provided by the New Mexico Medicaid False Claims Act in an amount to be determined at trial, plus a civil penalty for each violation.

## X.
## ESTIMATED DAMAGES

80.    Defendants' false claims date back at least to August 2019. However, the amount of overpayments received by Defendants as a result of their submission of a fraudulent CPT Codes that entitled them to receive risk adjustment payments is particular to the individual CPT Code submitted by Defendants (i.e., a CPT Code associated with chronic heart disease will provide a higher risk adjustment percentage of a risk adjustment payment than a CPT Code associated with alcoholism). Even more, the risk adjustment payments received for a particular patient is tied to a patient's underlying medical history. Thus, Relator is unable to obtain an accurate estimate of overpayments as a result of fraudulent risk adjustment payment CPT codes submitted to CMS by Defendants.

## PRAYER

**WHEREFORE,** Relator Matthew Andrew Garces prays for judgement against Defendants United Healthcare Services, Inc., Optum Care, Inc., WellMed Medical Management, Inc., WellMed Medical Group, P.A., and Episource, LLC as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*, Texas Human Resources Code § 36.001 *et seq.*, Florida Statute § 68.081 *et seq*), and New Mexico Statute § 27-14-1 *et seq.*;

2.    That this Court enter judgment against Defendants, pursuant to 31 U.S.C. §3729(a), in an amount equal to three times the amount of damages the Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That this Court enter judgment against Defendants, pursuant to TEX. HUM. RES. CODE § 36.052, in an amount equal to two times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $15,000 for each violation of the Texas Medicaid Fraud Prevention Act;

4.    That this Court enter judgment against Defendants, pursuant to Florida Statute § 68.082(2), in an amount equal to two times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the Florida False Claims Act;

5.    That this Court enter judgment against Defendants, pursuant to New Mexico Statute § 27-14-4, in an amount equal to two times the amount of damages the State of New Mexico has sustained because of Defendants' actions.

6.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

7.    That Relator be awarded the maximum amount allowed pursuant to Texas Human Resources Code § 36.110(a) and/or any other applicable provision of law;

8.    That Relator be awarded the maximum amount allowed pursuant to Florida Statute § 68.085 and/or any other applicable provision of law;

9.    That Relator be awarded the maximum amount allowed pursuant to New Mexico Statute § 27-14-9 and/or any other applicable provision of law;

10.    That Relator be awarded all costs of this action, including attorney's fees and expenses;

11.    That the Government, the State of Texas, and Relator be granted pre-judgement and post-judgment interest on the damages caused by Defendants; and

12.    That the Government, the State of Texas, and Relator recover such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury on all issues so triable.

Dated: June 1, 2020

WEST, WEBB, ALLBRITTON, & GENTRY, PC
1515 Emerald Plaza
College Station, Texas 77845
Telephone: (979) 694-7000
Facsimile: (979) 694-8000

By: _____
Gaines West
Texas Bar No. 21197500
gaines.west@westwebblaw.com

**ATTORNEY FOR RELATOR**
*Matthew Andrew Garces*

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

**DISCLOSURE STATEMENT PURSUANT TO 31 U.S.C. §§ 3730(e)(4)(B) AND 3730(b)(2) DISCLOSING MATERIAL EVIDENCE SUPPORTING FALSE CLAIM ACT COMPLAINT AGAINST DEFENDANTS UNITED HEALTHCARE SERVICES, INC., OPTUM CARE, INC., WELLMED MEDICAL MANAGEMENT, INC., WELLMED MEDICAL GROUP, P.A., &EPISOURCE, LLC**

*This document is subject to the attorney client privilege and the attorney work product doctrine and constitutes confidential material prepared by counsel for Relator in anticipation of litigation. Submission of this document to the United States Government is not and shall not be construed as a waiver by the Relator of any exemption from discovery of this document that otherwise applies.*

## I.
## INTRODUCTION

Pursuant to the False Claims Act 31 U.S.C. § 3729, *et seq.*, ("FCA") Relator Matthew Andrew Garces ("Relator"), voluntarily submits this disclosure statement to the United States Government in conjunction with the filing of the attached complaint against Defendants United Healthcare Services, Inc., Optum Care, Inc., WellMed Medical Management, Inc., WellMed Medical Group, P.A., and Episoure, LLC (collectively, the "Defendants") in the United States District Court – Western District of Texas (San Antonio Division), under seal pursuant to 31 U.S.C., § 3720, *et seq.* Relator has no reason to believe that any of the information upon which he bases his allegations of FCA violations has been publicly disclosed.

Relator is well positioned to bring this complaint as his knowledge of the fraudulent claims at issue is derived from his position as a registered nurse and current Senior Clinical Coding Nurse and Consultant for WellMed Medical Management, Inc. Upon information and belief, Defendants have overbilled Medicare and Medicaid, and failed to report such overpayments, since at least August 2019 when Relator began his current position giving him access to Defendants' medical coding policy and procedure. Namely, Defendants' lack of supervision and lack of training on the EMR software resulted in false and/or fraudulent claims being knowingly and/or recklessly submitted to Medicare and Medicaid.

Pursuant to the FCA, as well as the Texas Medicare Fraud Prevention Act ("TMFPA"; Texas Human Resources Code §36.001 *et seq.*), the Florida False Claims, Act (the "FFCA"; Florida Statute § 68.081 *et seq*), and the New Mexico Medicaid False Claims Act (the "NMMFCA"; New Mexico Statute § 27-14-1 *et* seq), (collectively with the FCA, TMFPA, and FFCA the "False Claim Acts"), Relator estimates that damages related to Medicare and Medicaid claims improperly submitted by Defendants to be sufficient in size to warrant the Government's invention in this matter while the *actual* damages sustained by the Government cannot be legitimately obtained and/or determined by Relator given their relation to the individual CPT Code submitted as well as the patient's underlying medical history.

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

## II.
## PARTIES

A. **RELATOR:** Relator Matthew Andrew Garces is an adult citizen of the State of Texas. Relator is a registered nurse who was employed with WellMed Medical Management, Inc. as a Senior Clinical Coding Nurse and Consultant until May 2019. During his time in this position, Relator worked as an overseer of the work performed by Episource, LLC; an auditing company hired to perform the audit procedures set out by United Healthcare Services, Inc. and Optum Care, Inc., for all WellMed entities.

B. **DEFENDANT WELLMED MEDICAL GROUP, P.A.:** Defendant WellMed Medical Group, P.A., ("WellMed Medical Group") is a Texas professional association made up of physicians responsible for the care and treatment of patients within WellMed facilities across Texas, Florida, and New Mexico.

C. **DEFENDANT WELLMED MEDICAL MANAGEMENT, INC.:** Defendant WellMed Medical Management, Inc., ("WellMed Management") is a Texas corporation domiciled in San Antonio, Texas that owns and operates WellMed clinics in Texas, New Mexico, and Florida. Additionally, WellMed Management also manages the submission of insurance payments and claims for reimbursements to the Centers for Medicare and Medicaid Services ("CMS") for both WellMed-owned clinics as well as WellMed Medical Group.

D. **DEFENDANT OPTUM CARE, INC.:** Defendant Optum Care, Inc. ("Optum") is a foreign corporation registered to perform business in Texas and incorporated under the laws of Delaware. Optum Care, Inc., purchased WellMed Management in 2011.

E. **DEFENDANT UNITED HEALTHCARE SERVICES, INC.:** Defendant United Healthcare Services, Inc. ("United") is a foreign corporation registered to perform business in Texas and incorporated under the laws of Minnesota. United is Optum's parent company.

F. **DEFENDANT EPISOURCE, LLC:** Defendant Episource, LLC ("Episource") is a California limited liability company with its principal place of business in Gardena, California. Defendants United, Optum, WellMed Management, and WellMed Medical Group engaged Episource to provide medical record retrieval and auditing services to WellMed wherein Episource would audit the same to specifically increase the input of CPT codes entitling WellMed to unearned risk adjustment payments.

## III.
## APPLICABLE STATUTES AND PROGRAMS

A. **THE FEDERAL FALSE CLAIMS ACT.**

The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim

**ATTORNEY CLIENT PRIVILEGED**
**ATTORNEY WORK PRODUCT**
**CONFIDENTIAL MATERIALS**

to the United States is liable for damages in the amount of three (3) times the amount of loss the government sustained, and penalties which range between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Proof of specific intent to defraud is <u>not</u> required under the FCA. *Id.*

**B. TEXAS MEDICAID FRAUD PREVENTION ACT.**

The Texas Medicaid Fraud Prevention Act prohibits false claims for Medicaid reimbursement. Under Texas Human Resources Code § 36.002 persons are specifically prohibited from acts including:

(1)  Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)  Knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(9)  Conspiring to commit a violation of Subdivision (1), (2), or (13); and

(13)  Knowingly engaging in conduct that violates Section 32.039(b).

Under Texas Human Resources Code § 32.039(b), *inter alia*, it is a violation to solicit or receive, directly or indirectly, any remuneration, including any kickback, for referring a Medicaid patient.

**C. FLORIDA FALSE CLAIMS ACT.**

The Florida False Claims Act prohibits false claims for Medicaid reimbursement. Under Florida Statute § 68.082(2), a person commits an unlawful act if the person:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval (§ 68.082(2)(a));

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim (§ 68.082(2)(a)); and

(3) Conspires to commit a violation of the Florida False Claims Act (§ 68.082(2)(a)).

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

## D. NEW MEXICO MEDICAID FALSE CLAIMS ACT

The New Mexico Medicaid False Claims Act prohibits false claims for Medicaid reimbursement. Under New Mexico Statute § 27-14-4, a person commits an unlawful act if the person:

    (1) Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent (§ 27-14-4(A));

    (2) Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program (§ 27-14-4(B));

    (3) Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false (§ 27-14-4(C)); and

    (4) Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent (§ 27-14-4(D)).

## E. MEDICARE BACKGROUND.

Medicare is a federal healthcare program created in 1965 with the passage of the Social Security Amendments to ensure that citizens 65 and older as well as younger persons with certain disabilities have access to quality healthcare. Medicare is administered by the Department of Health and Human Services ("DHHS") through the Centers for Medicare and Medicaid Services ("CMS"). CMS manages Medicare programs by selecting official Medicare administrative contractors ("MACs") to process the Medicare claims associated with various parts of Medicare. Medicare as a healthcare plan is divided into different parts, each of which cover a specific healthcare service.

    (A)    Medicare Part A covers basic healthcare necessary to treat a pressing medical condition. Covered services may include hospital care, skilled nursing care, nursing home care, hospice care, and other support deemed essential to treating an illness or a condition.

    (B)    Medicare Part B covers services or supplies needed to treat or prevent a medical condition. Part B of Medicare also covers some preventive care services such as inpatient/outpatient mental health, clinical research, and ambulance services.

    (C)    Medicare Part C covers all healthcare services through a provider organization such as a hospital or a private practice. Patients must be enrolled in Medicare Parts A and B to qualify for Part C.

    (D)    Medicare Part D was created in 2003 with the passage of the Medicare Prescription

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

Drug, Improvement, and Modernization Act. It covers many prescription drug costs and is paid for by monthly premiums of Medicare enrollees.

## F. MEDICAID BACKGROUND.

Medicaid is a program that provides healthcare coverage for low-income families and individuals, for persons with disabilities, and in some cases the elderly. For medical billing purposes, the most important difference between Medicare and Medicaid is the organization of each program. Medicare is a program provided by the federal government through CMS and has universal applications across state boundaries. Medicaid is a program funded by both state governments and the federal government. States provide Medicaid benefits in cooperation with CMS and federal guidelines. Medicaid programs differ from state to state, though they must all meet certain standards established by the federal government.

Medicaid coverage plans can change from state to state. Some states have extended their Medicaid programs to cover comprehensive healthcare issues for recipients, while other states only meet the minimum program requirements as mandated by the federal government. The following are some of the minimum Medicaid services covered: inpatient/outpatient hospital services; family planning care; pediatric services; prescription drug costs; dental healthcare and services; mental health services; and occupational, physical, and speech therapy.

## IV.
## MEDICAL BILLING PROCESS

### A. CREATION OF MEDICAL RECORDS.

If a hospital wishes to participate in Medicare or Medicaid, it must comply with the standards and certificates set forth in 42 C.F.R. § 482 ("§482"), which (in relevant part) requires that "[a]ll patient medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form *by the person responsible for providing or evaluating the service provided*, consistent with hospital policies and procedures." 42 C.F.R. § 482.24(c)(1) (emphasis added).

Additionally, "[a]ll orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with state law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." *Id.* at § 482.24(c)(2). The requirements of §482 are vital as medical records created by the providing or evaluating practitioner begin the medical billing process.

### B. APPLICATION OF CURRENT PROCEDURAL TERMINOLOGY CODES.

Traditionally, healthcare providers employ billing departments to convert a patient's medical chart into a claim that itemizes the appropriate Current Procedural Terminology Codes ("CPT Codes" or "Billing Codes") associated with the treatment provided to the patient.

**ATTORNEY CLIENT PRIVILEGED**
**ATTORNEY WORK PRODUCT**
**CONFIDENTIAL MATERIALS**

Medicare/Medicaid then uses the Billing Codes submitted on the claim to determine the level of reimbursement for those Billing Codes, and ultimately, pays the healthcare provider for the services it rendered to the patient.

Billing Codes are established each year by the American Medical Association ("AMA"). The AMA publishes a book containing the CPT Codes, with each code containing five digits. The CPT Code first appeared in 1966 and acts as a dictionary, defining the service performed by the physician that is billed with each five-digit code. This definition, to which the 5-digit numerical code is assigned, is known as a "descriptor."

When billing Medicare or Medicaid a particular CPT Code, the practitioner and/or hospital is attesting to fact that the service described in the descriptor of the code billed was performed, and that he/she/it is entitled to the reimbursement for that particular code.

Healthcare providers are very familiar with CPT Codes, their descriptors, and the amount of reimbursement Medicare/Medicaid pays for each code. Some hospitals and billing companies structure their coding to improperly maximize reimbursement by billing CPT Codes which were either not performed at all, or which do not accurately represent the services which were performed, or which were not medically necessary, or which are bundled into other services, or which are not adequately/properly documented to evidence that the service was performed. Presently, Defendants improperly structure their coding to ensure that a patient is categorized into a "High Risk" class, thereby entitling them to a higher risk adjustment reimbursement rates from Medicare/Medicaid.

Coding of this sort, when performed with actual knowledge, deliberate ignorance, or with reckless disregard constitutes an actionable false claim under the FAC and TMFPA.

C.  **PAYMENT OF RISK ADJUSTMENT REIMBURSEMENTS FOR THE NEXT CALENDAR YEAR BASED ON PRECEDING YEAR PATIENT DIAGNOSES.**

Risk adjustment payments are awarded to physicians upon providing CPT Codes coupled with medical documentation that a patient has a chronic condition (*i.e.,* chronic kidney disease, diabetes, etc.). The purpose of risk adjustment payments is two-fold: 1) to preemptively award physicians with treatment charges for the next calendar year for the treatment of the patient's chronic condition that will more often than not be treated during and in addition to other typical medical appointments; and 2) to ensure physicians are not turning patients away for basic care because the physician felt they were not being paid for their services to treat the chronic condition in addition to or at the same time as ordinary patient care.

In order for physicians to receive risk adjustment payments, they must document the chronic condition with the corresponding CPT Code. A chronic condition cannot be coded using the risk adjustment payment CPT Code without proper documentation that the patient has a chronic condition.

Acceptable practices for proper documentation to justify the entering of a risk adjustment CPT

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

Code include documentation that supports the physician monitored, evaluated, assessed or treated the patient for the chronic condition sometime during the previous calendar year.

Failure to adjust submissions of CPT Codes for risk adjustment payments for which appropriate medical documentation does not exist constitutes an actionable false claim under the FAC and TMFPA.

D. **AUDITING OF MEDICAL RECORDS**.

As a safeguard to ensure proper medical billing, healthcare providers employ billing departments, often comprised of nurses and physicians that are familiar with both the treatment of patients as well as the billing codes to be employed for such treatment. Additionally, billing departments include individuals tasked with auditing the associated Billing Codes generated through the billing department ("Auditing Teams" or "Auditing Department").

If the Auditing Department identifies any discrepancies (i.e., missing or improper information), the records must be sent back to the treating or evaluating practitioner to be modified and properly notated, as required by applicable hospital policy and §482. Additionally, Auditing Teams review the CPT Codes generated by the billing department to ensure the medical records adequately and legitimately support the claim to be submitted to Medicare/Medicaid. Essentially, Auditing Teams are tasked with ensuring that the treatment provided to a patient and the associated Billing Codes are valid and proper prior to a claim being submitted to Medicare or Medicaid.

Alternatively, healthcare providers may outsource the auditing of their claims to third parties. Presently, Defendants Episource, which utilized medical billing auditing teams based in the Philippines, to provide medical record retrieval and auditing services to WellMed. Episource retrieves a patient's medical records manually or electronically and audits those documents for risk adjustment Billing Codes for the sole purpose of submitting those codes to Medicare/Medicaid for increased risk adjustment reimbursement payments.

## V.
## OPERATIVE FACTS

Defendants have overbilled Medicare/Medicaid, and failed to report such overpayments, since at least August 2019—when Relator became Senior Clinical Coding Nurse and Consultant for WellMed Management. Defendants' billing departments deceptively insert Billing Codes associated with chronic diseases, without the required supporting documentation, in order to entitle Defendants to risk adjustment payments. Namely, Defendants routinely insert a CPT Code associated with a chronic illness on a claim if they see that a medication used in the treatment of a chronic illness was prescribed to a patient despite the fact that the treating physician did not enter such a diagnosis in the patient's medical records.

Accordingly, Defendants conspired to submit and, ultimately, submitted false claims to Medicare/Medicaid by submitting claims stating a patient has been diagnosed with a chronic disease when he/she was not so diagnosed in order to improperly receive risk adjustment payments.

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

Even more, Defendants' fail to correct their misdiagnosis and failed to report the overpayments to Medicare/Medicaid once a misdiagnosis is brought to their attention. More determinatively, the submission of CPT Codes that entitled Defendants to receive a higher percentage of reimbursement (i.e., 60%) from Medicare/Medicaid than it normally would (i.e., 30%) for all treatment it provided to the patient. Thus, Defendants were not only seeking reimbursement for a CPT Code that lack supporting documentation, the submission of that CPT Code wrongfully permitted Defendants to receive money from Medicare/Medicaid that they were not entitled to in regards to the all other treatment as such reimbursements were paid out at the higher rick adjustment percentage.

## VI.
## EVIDENCE OF MEDICARE/MEDICAID FRAUD

Relator observed the following examples of billing and medical deficiencies while working as a Senior Clinical Coding Nurse and Consultant. While many additional audit/billing deficiencies were identified before, during, and after Relator's employment, this cross-section is provided to exemplify the kind of deficiencies Relator personally observed which indicate Defendants are improperly collecting funds from Medicare/Medicaid on the basis of inadequately documented records or on the basis of inappropriate augmentation of medical records.

The examples provided are categorized into two basic groups: (1) examples of Defendants approving of diagnoses that patients ultimately did not have that fraudulently qualified Defendants for risk adjustment payments; and (2) examples of Defendant's failure to provide adequate auditing to correct illegitimate diagnoses that fraudulently qualified Defendants for risk adjustment payments from CMS.

A. **EXAMPLE OF DEFENDANT'S FAILURE TO PROVIDE ADEQUATE MEDICAL RECORDS TO SUPPORT SUBMISSION FOR RISK ADJUSTMENT PAYMENTS.**

**Patient VG:** Patient VG was misdiagnosed by Episource auditor Poorva Narasimhan with Chronic Systolic (Congestive) Heart Failure (CPT Code I50.22) for date of service June 12, 2018. However, Patient VG was not diagnosed by a physician with Chronic Systolic (Congestive) Heart Failure on June 12, 2018. Instead, well after CPT Code I50.22 was input, Patient VG was diagnosed by Dr. Nicolas Walsh with Takotsubo Cardiomyopathy (also known as "Broken Heart Syndrome"; a heart condition involving a weakening of the left ventricle due to extreme stress) on February 21, 2019, which is reflected by the submission of CPT Code I51.81. Thus, CPT Code I50.22 was submitted to Medicare for a risk adjustment payment for 2018 in error because the patient was diagnosed with a more specified CPT Code, which does not qualify for a risk adjustment payment. As such, Defendants submitted a false claim to the Government and improperly failed to correct or report/repay the overpayments they received.

All documentation within Relator's possession evidencing the above described fraud is attached hereto as Exhibit A.

ATTORNEY CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL MATERIALS

B. **EXAMPLE OF DEFENDANT'S FAILURE TO PROVIDE ADEQUATE AUDITING TO CORRECT ILLEGITIMATE DIAGNOSES OF PATIENTS FRAUDULENTLY QUALIFYING DEFENDANTS FOR RISK ADJUSTMENT PAYMENTS.**

**Patient SB**: Patient SB was misdiagnosed with Type 2 Diabetes with Diabetic Chronic Kidney Disease (CPT Code E11.22) for date of service November 8, 2018 and date of service April 4, 2019. The sole source of supportive documentation used by Episource auditors for the entry and submission of this diagnoses was patient's past medical history with a diuretic medication.

Additionally, due to being misdiagnosed with Type 2 Diabetes with Diabetic Chronic Kidney Disease, Patient SB was also misdiagnosed with Chronic Kidney Disease Stage 2 (Mild) on November 8, 2018 and April 4, 2019. These are not acceptable coding practices according to Medicare guidelines. In fact, Patient SB's primary care physician also disagreed with the diagnoses on an attestation form which is a means of communication between the patient's healthcare provider and the medical coder/auditor. Nevertheless, Defendants submitted the fraudulent claim to the Government in order to receive risk adjustment payments.

Relator alleges that these examples are demonstrative of a much larger pool of claims submitted to CMS by Defendants with the intent to receive risk adjustment payments for which Defendants do not have proper medical documentation. Although narrow in scope here due to Relator's limited exposure to claims only submitted for audit, it is reasonably believed that the true number of fraudulent claims is significant in nature and harmful to the Government on an exponential level.

All documentation within Relator's possession evidencing the above described fraud is attached hereto as Exhibit B.

## VII.
## ESTIMATED DAMAGES

Defendants' false claims date back at least to August 2019. However, the amount of overpayments received by Defendants as a result of their submission of a fraudulent CPT Codes that entitled them to receive risk adjustment payments is particular to the individual CPT Code submitted by Defendants (i.e., a CPT Code associated with chronic heart disease will provide a higher risk adjustment percentage of a risk adjustment payment than a CPT Code associated with alcoholism). Even more, the risk adjustment payments received for a particular patient is tied to a patient's underlying medical history. Thus, Relator is unable to obtain an accurate estimate of overpayments as a result of fraudulent risk adjustment payment CPT codes submitted to CMS by Defendants.

# EXHIBIT A
# PATIENT VG







**21182191/151148373**

Date of Birth



| Admit Date | Discharge Date |
|---|---|
| 22-Mar-2019 | |



**University Health System**

**TRANSPLANT (KLP) Clinic Note (SD)**

Note Date

2/21/2019 10:00:00 AM

---

**Patient Demographics:**
Patient is a 56 year old Male.

**History:**
- **Chief Complaint:**
- **HPI**

f/u s/p SLK txps
Hx of liver-kidney transplant on 5/24/2018. He is followed by hepatology as well.

56 yo male s/p liver-kidney transplant (5/23/18) for EtOH cirrhosis with HBcAb positive donor. Complicated by post-op takotsubo cardiomyopathy (by 9/27/18 EF: 55% and without wall motion abnormality), mentation problems, and hyperkalemia.
His mentation has improved drastically. Has had complications with neutropenia, CMV and BK. Received Neupogen off and on

Admitted on 9/26/18 for edema (eating lots of salty snacks) and diarrhea and found to have C diff. Started on po vanco..
Admitted again from Transplant Clinic for CMV with viral load >10K. Colon bx showed tissue invasive CMV. PCR: 37600 -> <137.
Yet another admit early last week for hyperK+ in setting of high CsA.

Recently discharged Jan 2019 ,admitted for hyperkalemia.

Review of Systems:
General/Constitutional: No fevers, chills, diaphoresis, or weight loss
Eyes: no icterus or visual changes
ENMT: no oral ulcerations, ear pain, changes in hearing, or nasal discharge
Cardiovascular: No chest pain or palpitations
Pulmonary/Respiratory: No shortness of breath or cough
Gastrointestinal: No nausea, vomiting, diarrhea, or constipation
Genitourinary: No dysuria
Dermatology/Integument: No rashes
Psychiatric: No suicidal or homicidal ideations. No auditory or visual hallucinations
Neurologic: No dysarthria or dysphagia. No headaches, No

**CONFIDENTIAL**

21182191/151148373

Date of Birth
**CONFIDENTIAL**

Admit Date          Discharge Date

**University Health System**

University Health System

Note Date

changes in sensation

## Prior Surgeries/Hospitalizations/Studies:

- **Liver and kidney transplants**: May-23-2018

## Current Medication List:

- **SandIMMUNE 25 mg oral capsule**: Review Status: Verified, Comment: Avoid grapefruit and grapefruit juice while taking this medication.
  It is very important that you take or use this exactly as directed. Do not skip doses or discontinue unless directed by your doctor.
  , 3 cap(s) orally once a day (in the evening) x 30 days, Status: Active, Quantity: 90, Refills: None
- **cycloSPORINE 100 mg oral capsule**: Review Status: Verified, Comment: Avoid grapefruit and grapefruit juice while taking this medication.
  It is very important that you take or use this exactly as directed. Do not skip doses or discontinue unless directed by your doctor.
  , 1 cap(s) orally once a day (in the morning) x 30 days, Status: Active, Quantity: 30, Refills: None
- **cholecalciferol 2000 intl units oral capsule**: Review Status: Verified, 1 cap(s) orally once a day, Status: Active, Quantity: 30, Refills: 6
- **Prenatal Multivitamins with Folic Acid 1 mg oral tablet**: Review Status: Verified, 1 tab(s) orally once a day, Status: Active, Quantity: 30, Refills: 6
- **sodium bicarbonate 650 mg oral tablet**: Review Status: Verified, 0.5 tab(s) orally once a day x 60 days, Status: Active, Quantity: 30, Refills: None
- **vancomycin 125 mg oral capsule**: Review Status: Verified, 1 cap(s) orally 3 times a week x 14 days from 2/7 to 3/6, Status: Active, Quantity: 6, Refills: None
- **albuterol 90 mcg/inh inhalation aerosol**: Review Status: Verified, 2 puff(s) inhaled every 4 hours x 30 days as needed for cough/ wheeze/chest tightness. Status: Active, Quantity: 17, Refills: 2
- **Androderm 4 mg/24 hr transdermal film, extended release**: Review Status: Verified, Comment: Caution federal law prohibits the transfer of this drug to any person other than the person for whom it was prescribed.
  Do not take this drug if you are pregnant.
  For external use only.
  Obtain medical advice before taking any non-prescription drugs as some may affect the action of this medication.
  , Apply topically to affected area once a day (at bedtime) x 30 days, Status: Active, Quantity: 1, Refills: 3
- **raNITIdine 150 mg oral tablet**: Review Status: Verified, Comment: It is very important that you take or use this exactly as directed. Do not skip doses or discontinue unless directed by your doctor.
  Obtain medical advice before taking any non-prescription drugs as some may affect the action of this medication.
  , 1 tab(s) orally 2 times a day x 30 days, Status: Active, Quantity: 60, Refills: 11

**CONFIDENTIAL**

21182191/151148373

Date of Birth
**CONFIDENTIAL**

Admit Date          Discharge Date


**University Health System**

University Health System

Note Date

---

- **melatonin 10 mg oral capsule**: Review Status: Verified, Comment: Do not drink alcoholic beverages when taking this medication.
  Do not take this drug if you are pregnant.

  May cause drowsiness. Alcohol may intensify this effect. Use care when operating dangerous machinery.
  This drug may impair the ability to drive or operate machinery. Use care until you become familiar with its effects.
  , 1 cap(s) orally once a day (at bedtime), Status: Active, Quantity: 30, Refills: None
- **entecavir 0.5 mg oral tablet**: Review Status: Verified, Comment: Check with your doctor before becoming pregnant.
  Obtain medical advice before taking any non-prescription drugs as some may affect the action of this medication.
  Take medication on an empty stomach 1 hour before or 2 to 3 hours after a meal unless otherwise directed by your doctor.
  , 1 tab(s) orally once a day, Status: Active, Quantity: 30, Refills: 1
- **predniSONE 5 mg oral tablet**: Review Status: Verified, Comment: It is very important that you take or use this exactly as directed. Do not skip doses or discontinue unless directed by your doctor.
  Obtain medical advice before taking any non-prescription drugs as some may affect the action of this medication.
  Take with food or milk.
  , 1 tab(s) orally once a day, Status: Active, Quantity: 30, Refills: 5
- **Aspirin Enteric Coated 81 mg oral delayed release tablet**: Review Status: Verified, 1 tab(s) orally once a day, Status: Active, Quantity: 0, Refills: None
- **pentamidine 300 mg Inhalation powder for reconstitution**: Review Status: Verified, 1 each inhaled every 4 weeks (last dose 12/20), Status: Active, Quantity: 0, Refills: None
- **ZyrTEC 10 mg oral tablet**: Review Status: Verified, 1 tab(s) orally once a day, Status: Active, Quantity: 0, Refills: None

**Medication Review:**
Medication Reviewed and is accurate based on chart and patient info.

**ALLERGIES:**
- **No Known Allergies**

**Abuse Screening:**
Are you currently in any relationships that make you feel unsafe?: no

**Smoking Status:**
- **Have you ever smoked?**          Yes [1]



**CONFIDENTIAL**

21182191/149489255

Date of Birth

**CONFIDENTIAL**

| Admit Date | Discharge Date |
|---|---|
| 22-Jun-2018 | |

 **University Health System**

University Health System

**REHAB Resident Progress Note (SFD)**

Note Date

6/12/2018 10:09:00 AM

**Admission History:**

**Chief Complaint:**

Impaired ability to ambulate, transfer and carry out self-care tasks[1]

**HPI**

55 yo male with EtOH cirrhosis (MELD 33) complicated by recurrent ascites with hx of SBP, EV, and HE, CKD with recurrent AKIs, and anemia, recently admitted for concern for confusion and ARF on CKD and discharged on 5/22/18 then readmitted 5/23/18 for simultaneous liver-kidney transplant. Hospital course complicated by post-op fevers/hypotension with concern for sepsis of unclear etiology (now improved), gradually declining LVEF with Cardiology following, and thrombocytopenia (Plat 28 on 5/31).

Admit Hosp: 4/20/2018
Admit Reeves: 6/1/18
Planned DC: 6/12/18

Team conference performed 6/5/18, discussed patient progress, plan for discharge 6/12/18. He will need shower chair and wheelchair as well as outpatient therapy upon discharge.

ADMIT FIMs:
· Eating Modified Independent (FIM6)
· Toileting        Minimum Assist (FIM4)
· Transfers: Bed, Chair, Wheelchair        Minimum Assist (FIM4)
· Locomotion: Walk, Wheelchair Maximum Assist (FIM2)
· Bowel Minimum Assist (FIM4)
· Comprehension        Minimum Assist (FIM4)
· Expression    Minimum Assist (FIM4)
· Memory        Minimum Assist (FIM4)
· Current Level of Function Summary      Mod A with gait, min A with bed mobility and mod assist with sit to stand

Updated FIMS as of 6/8:
Transfers:
-Bed/Chair: 6
-Toilet: 5
Locomotion:5
-Walk/WC: 5 --400 x walker
-Stairs:



**21182191/149489255**

Date of Birth



Admit Date          Discharge Date

**University Health System**

Note Date

UBD:6
LBD:6
Bathing: 5
Grooming: 6
Toileting: 6
Eating: 7
Bowel: 6
Comp: 5
Expresion: 5
Memory: 6
Social:7
Problem Solve:5
O-Log 26/30

PLOF:
Home(duplex) 1 STE, TSC with chair, lives with sister.

COURSE:
6/12: New plan is to DC to SNF now as sister states she
cannot take care of patient as she already is the caregiver for
3 adults. Thus, we are now awaiting acceptance of patient
into SNF, though it appears his insurance does not cover this.
If this is the case, will have to discuss transfering patient to
transplant surgery as he does meet acute inpatinet rehab
criteria. Otherwise doing well medically.

6/11: 136/4.6/99/32/12/0.8. LFTS 5.4/2.4/0.4/x/8/14/56.
Good urine output, labs looking good. No complaints this AM
no events over the weekend. Plan for discharge tomorrow.
Has made good progress in FIMs since admit. O Log 26/30.
Eating nearly 100% fo meals. Stopped diflucan today,
finished course.

6/8: Doing very well. Saw patient this AM, he was playing
video games on his phone that required strategy. Also when
asked what he was doing, stated " I am just waiting for
therapy at 9:45". This was correct as he had picked up his
schedule and looked at it and understood what time therapy
was. He is eating 100% of meals, will ask nutrition to



**21182191/149489255**

Date of Birth


Admit Date                Discharge Date

**University Health System**

University Health System

Note Date

---

was. He is eating 100% of meals, will ask nutrition to recalculate calorie needs as he may need more. his appetite is very good. Making excellent progress with therapy per FIMs above. Labs look good, making >1000 cc urine daily.

Incisions are C/D/I. Plt count uptrending, tacrolimus level 2.5 currently on 4/2 dosing. GOAT 95/100 yesterday.

6/7: Ordered echo yesterday due to admission with severe global hypokinesis and EF 25%. Repeat now with EF 45-50% and signifiacnt improvement in global kinesis, now with mild global hypokinesis. This indicates prior was most likely due to stress myocardiopathy due to severe liver/kidney disease. doing well overall today. Tacrolimus level low, dose changed to 4/2. LFT and BMP panels good, with good UOP. Eating 50% of breakfast, 100% lunch/dinner. asked him if he felt he was getting enough calories, he said yes, doesn't fell unsatisfied with meals. Making progress in therapy- see FIM above. Was called at 11 AM as OT therapy thought patient was altered, I checked on patietn at 11:15 and speech was in room with patient, they did not seem concered. He was A/O x 4 for me, even stated that written date on board said january "but we are in June" he stated. Negative asterixis on physical exam. Ordered VBG after this AM's CO2 was mildy elevated at 30, shows 7.4/52, may have some baseline COPD/emphysema. This can be followed up with PCP on outpatient basis. Mag 1.5 this AM, changed mag oxide from two times a day to three times a day. Overall doing well, no signifiacnt changes to plan.

6/6: JP drain removed today, eat 90-100% of meals of lunch/dinner. Making progress with speech, orientation now 26 (was 21). LFTs look good, BMP good, 140/4.5/104/28/17/0.8/90, urine output adequate 1200 mL. TTE repeat today now medically stable to check LVEF and wall motion. If not improved and plts are improved, may need further ischemic workup during inpatient. CBC stable 3/8.8/27/68

6/5/18: NAEON. Calorie counts being performed after transplant team concerned for low calorie intake, per daily



**CONFIDENTIAL**

21182191/149489255

Date of Birth
CONFIDENTIAL

Admit Date          Discharge Date



**University Health System**

University Health System

Note Date

---

chart check, he tends to eat ~50% of his breakfast and 80-100% of his lunch and dinner, he states he is not a big breakfast eater. Order placed to increaes PM calories with lunch and dinner and snack between all meals. Making good urine, no acute medical issues. Main therapy issues is cognition. Oritentation Log is 21/30 ( 26 WNL)

6/4/18: Pleasant, but mildly confused this AM, A/O x 2. No issues. Continue POC.

Admit 6/1/18: NAEON

Physical Exam:
GEN: Alert, NAD, pleaseant.
HEENT: Mild ixterus
CV: RRR
LUNG: non labored room air
ABD: non distended, scar x 2 BS x4
MSK: moves all 4 extremities spontanously
NEURO: A/Ox2, impaired recall, can recall 1 of 3 after 5 mins
EXT: no C/C/E
DERM: incisions CDI of abdmonen s/p LKT

**Smoking Status:**
Unknown.

**Rehab Flow sheet:**
**Team FIM Flowsheet:**

| Date/Time | Jun-11-2018 00:08 | Jun-11-2018 09:06 | Jun-11-2018 10:40 | Jun-11-2018 11:59 | Jun-11-2018 14:38 |
|---|---|---|---|---|---|
| Eating-Level of Assistance | | | 7 - Fed self/Opened packages/Cut food/Regular consistency diet | | 6a - Needed device/Swallow technique/Special food, Fluid consistency/ Extra time/Inserted own |

**CONFIDENTIAL**

21182191/149489255

Date of Birth
CONFIDENTIAL

Admit Date                     Discharge Date


University
Health System

University Health System

Note Date

| | | | | | dentures |
|---|---|---|---|---|---|
| **Grooming-Level of Assistance** | | | | | 6 - Needed device or extra time/Patient obtained all articles needed |
| **Bathing-Level of Assistance** | | | | | 5 - Supervision/ Set up/Cues |

| | | | | | adjusted water temperature, collects supplies (10/10) |
|---|---|---|---|---|---|
| **Dressing - Upper Body** | | | | | 5a - Staff got clothes from closet |
| **Dressing - Lower Body** | | | | | 5a - Staff got clothes from closet |
| **Toileting** | 5 - Supervision/ Set-up/Cues | | 5 - Supervision/ Set-up/Cues | | 5 - Supervision/ Set-up/Cues |
| **Bladder - Level of Assistance** | 5b - Staff emptied urinal/BSC/b edpan | | 5b - Staff emptied urinal/BSC/b edpan | | |
| **Bladder - Frequency of Accidents** | 6 - No accidents, uses devices such as cath, urinal, BSC, meds, pad | | 6 - No accidents, uses devices such as cath, urinal, BSC, meds, pad | | |
| **Bowel - Level of** | 6a - | | 6a - | | |



**21182191/149489255**

Date of Birth

CONFIDENTIAL

**University Health System**

| Admit Date | Discharge Date | | Note Date |

| Assistance | Medication for bowel control - taken by self | | Medication for bowel control - taken by self | | |
|---|---|---|---|---|---|
| Bowel - Frequency of Accidents | 6 - No accidents, uses devices (colostomy, bedpan, BSC, diaper, meds) | | 6 - No accidents, uses devices (colostomy, bedpan, BSC, diaper, meds) | | |
| Bed, Chair, Wheelchair Transfer (actual bed transfer only - no simulation) Bed, Chair, Wheelchair Transfer | | | | 4 - Needed steadying or help with l limb | 6 - Needed sliding board, walkr, rails, chair arms, extra time, or raised own HOB (no helper) |
| Toilet Transfer (actual continent toileting only - no simulation) Toilet Transfer | | | | 6 - Used raised toilet seat, grab bars with no help | 6 - Used raised toilet seat, grab bars with no help |
| Shower Transfer | | | | | 6 - Used grab bars sliding board, (no help) |
| Walk - Distance | | | | 3 - 150 feet or greater | |
| Walk - Locomotion | | | | 5a - Walks minimum 150 ft. w/ Supervision/ Set-up/Cues /Stand by Assist | |

CONFIDENTIAL

21182191/149489255

Date of Birth
CONFIDENTIAL



**University Health System**

University Health System

| Admit Date | Discharge Date | | | Note Date | |

| | | | | | |
|---|---|---|---|---|---|
| **Locomotion Type** | | | | 1 - Walk | |
| **Stairs (One flight is 12-14 stairs) Stairs** | | | | 5b - Goes up/down 12-14 steps with supervision, cues, coaxing | |
| **Comprehension - Native Language Comprehension - Native Language** | 5a - Needs cues to understand (Basic tasks) | 4 - Understands basic 75-90% | | | 4 - Understands basic 75-90% |
| **Comprehension Type Comprehension** | 1 - Auditory | 1 - Auditory | | | 1 - Auditory |

| | | | | | |
|---|---|---|---|---|---|
| **Type** | | | | | |
| **Expression - Native Language Expression - Native Language** | 5b - Expresses basic needs or ideas > 90% of the time | 4b - Expresses basic 75-90% of time - Needs to repeat words | | | 4b - Expresses basic 75-90% of time - Needs to repeat words |
| **Expression Type Expression Type** | 1 - Vocal | 1 - Vocal | | | 1 - Vocal |
| **Social Interaction Social Interaction** | 5 - Interacts appropriately > 90% of time- Needs monitoring or encouragement for participation or interction | 3 - Interacts appropriately 50-74% of time - May be physically or verbally inappropriate | | | 3 - Interacts appropriately 50-74% of time - May be physically or verbally inappropriate |

**GARCIA, VICTOR**

**21182191/149489255**

Date of Birth

May-29-1962

| Admit Date | Discharge Date |
| --- | --- |

**University Health System**

University Health System

Note Date

| Problem Solving Problem Solving | 5b - Solves basic problems > 90% of the time | 3 - Solves basic problems 50-74% of the time | | | 3 - Solves basic problems 50-74% of the time |
| --- | --- | --- | --- | --- | --- |
| Memory Memory | 5 - Recognizes, recalls, or executes 3 steps of 3 step request > 90% of time (cueing, reminders <10%, loses track of time) | 3 - Recognizes, recalls or executes 50-74% of time 2 steps of 2 step request | | | 3 - Recognizes, recalls or executes 50-74% of time 2 steps of 2 step request |

**Therapy Treatment (FS):**

| Date/Time | Jun-11-2018 09:06 | Jun-11-2018 11:59 | Jun-11-2018 14:38 |
| --- | --- | --- | --- |
| Procedures | | | 00197175 |

| | | | SELF CARE/HME MGT TRNG 15MI OT |
| --- | --- | --- | --- |
| Quantity | | | 6 |
| Procedures | | GAIT TRAIN.,INCL.S TAIRS(15MIN) 00191558 | |
| Quantity | | 2 | |
| Procedures | | THERAPEUTI C EX/PROC EA15MIN PT 00197268 | |
| Quantity | | 2 | |
| Procedures | | THERAPEUTI C ACTIV EA 15 MIN PT | |

**CONFIDENTIAL**

21182191/149489255

Date of Birth
CONFIDENTIAL

Admit Date          Discharge Date


**University Health System**

University Health System

Note Date

| | | 15 MIN PT 00197179 | |
|---|---|---|---|
| **Quantity** | | 2 | |
| **Comprehension - Native Language** Comprehension - Native Language | 4 - Understands basic 75-90% | | 4 - Understands basic 75-90% |
| **Comprehension Type** Comprehension Type | 1 - Auditory | | 1 - Auditory |
| **Expression - Native Language** Expression - Native Language | 4b - Expresses basic 75-90% of time - Needs to repeat words | | 4b - Expresses basic 75-90% of time - Needs to repeat words |
| **Expression Type** Expression Type | 1 - Vocal | | 1 - Vocal |
| **Social Interaction** Social Interaction | 3 - Interacts appropriately 50-74% of time - May be physically or verbally inappropriate | | 3 - Interacts appropriately 50-74% of time - May be physically or verbally inappropriate |

| | | | |
|---|---|---|---|
| **Problem Solving** Problem Solving | 3 - Solves basic problems 50-74% of the time | | 3 - Solves basic problems 50-74% of the time |
| **Memory** Memory | 3 - Recognizes, recalls or executes 50-74% of time 2 steps of 2 step request | | 3 - Recognizes, recalls or executes 50-74% of time 2 steps of 2 step request |
| **Eating-Level of Assistance** | | | 6a - Needed device/Swallow technique/Spe |

**CONFIDENTIAL**

21182191/149489255

Date of Birth
CONFIDENTIAL

Admit Date                Discharge Date



**University Health System**

University Health System

Note Date

| | | | |
|---|---|---|---|
| | | | cial food, Fluid consistency/Extra time/Inserted own dentures |
| **Grooming-Level of Assistance** | | | 6 - Needed device or extra time/Patient obtained all articles needed |
| **Bathing-Level of Assistance** | | | 5 - Supervision/Set up/Cues adjusted water temperature, collects supplies (10/10) |
| **Dressing - Upper Body** | | | 5a - Staff got clothes from closet |
| **Dressing - Lower Body** | | | 5a - Staff got clothes from closet |
| **Toileting** | | | 5 - Supervision/Set-up/Cues |

| | | | |
|---|---|---|---|
| **Toilet Transfer (actual continent toileting only - no simulation) Toilet Transfer** | | 6 - Used raised toilet seat, grab bars with no help | 6 - Used raised toilet seat, grab bars with no help |
| **Shower Transfer** | | | 6 - Used grab bars sliding board. (no help) |
| **Bed, Chair, Wheelchair Transfer** | | 4 - Needed steadying or | 6 - Needed sliding board |



**CONFIDENTIAL**

21182191/149489255

Date of Birth


Admit Date                  Discharge Date



**University Health System**

Note Date

| | | |
|---|---|---|
| Wheelchair Transfer (actual bed transfer only - no simulation) Bed, Chair, Wheelchair Transfer | | steadying or help with 1 limb |
| | | sliding board, walkr, rails, chair arms, extra time, or raised own HOB (no helper) |
| Walk - Distance | | 3 - 150 feet or greater |
| Walk - Locomotion | | 5a - Walks minimum 150 ft. w/ Supervision/Set-up/Cues/Stand by Assist |
| Locomotion Type | | 1 - Walk |
| Stairs (One flight is 12-14 stairs) Stairs | | 5b - Goes up/down 12-14 steps with supervision, cues, coaxing |
| Toileting | | 5 - Supervision/Set-up/Cues |

| | | |
|---|---|---|
| General Exercise | | Pt performed therapeutic exercises for improved strengthening to assist with functional |

**CONFIDENTIAL**

21182191/149489255

Date of Birth

CONFIDENTIAL

Admit Date                Discharge Date

**University Health System**

University Health System

Note Date

transfers and
gait: Supine
SAQ 2X20
reps, Heel
Slides 2x15
reps, Seated
Heel Raises
2x15 reps
Pt performed
therapeutic
activities to
promote
increased
independence
with bed
mobility and
transfers: Stair
Training SBA,
Car Transfer
SBA,
WC<>BED
MOD I,
Sit<>Supine
Mod I,
Supine<>sit
Min A, toilet
transfer Mod I

**02 I&O (FS):**

| Date/Time | Jun-11-201 8 02:00 | Jun-11-201 8 07:00 **Daily** | Jun-11-201 8 08:00 | Jun-11-201 8 13:00 | Jun-11-201 8 15:00 |
|---|---|---|---|---|---|
| **Length of Stay Totals** | | Intake:<br><br>8495<br>Output: | | | |

| | | 7190<br>Net:<br><br>1305 | | | |

**GARCIA, VICTOR**

**21182191/149489255**

Date of Birth

May-29-1962

Admit Date                    Discharge Date

 **University Health System**

University Health System

Note Date

| Grand Totals | Intake: Output: Net: 24 Hr.: -650 | Intake: 720 Output: 1370 Net: -650 24 Hr.: -650 | Intake: 0 Output: 0 Net: 0 24 Hr.: 0 | Intake: 0 Output: 0 Net: 0 24 Hr.: 0 | Intake: 0 Output: 0 Net: 0 24 Hr.: 0 |
|---|---|---|---|---|---|
| Oral | | In: 720 | | | |
| Void mL | | Out: 1370 | | | |
| Stool Count | 1 | | | | 1 |
| Intake (%) | | | 100% (entire meal or minimal amt left) | 100% (entire meal or minimal amt left) | |

| Date/Time | Jun-11-2018 18:00 | Jun-11-2018 20:03 | Jun-11-2018 23:00 Shift |
|---|---|---|---|
| Length of Stay Totals | | | Intake: 8495 Output 7290 Net: 1205 |
| Grand Totals | Intake: 0 Output: 0 Net: 0 24 Hr.: 0 | Intake: Output: 100 Net: -100 24 Hr.: -100 | Intake: Output 100 Net: -100 24 Hr.: -100 |
| Void mL | | Out: 100 | Out: 100 |
| Intake (%) | 50% (Aprox 1/2 of meal) | | |

**01 Vital Signs (FS):**

| Date/Time | Jun-12-2018 05:04 | Jun-12-2018 05:34 | Jun-12-2018 08:00 |
|---|---|---|---|
| Temp F Temperature F | 98.6 | | |
| Temp C Temperature C | 37 | | |



**21182191/149489255**

Date of Birth

CONFIDENTIAL

**University Health System**

University Health System

| Admit Date | Discharge Date | Note Date |

| | | | | |
|---|---|---|---|---|
| **Respiratory Rate Respiratory Rate ( /min)** | 20 | | | |
| **SaO2 O2 Sat (%)** | 100 | | | |
| **Heart Rate Heart Rate ( /min)** | 72 | | | 67 |
| **NIBP (S) NIBP Systolic** | 104 | | | 106 |
| **NIBP (D) NIBP Diastolic** | 67 | | | 68 |
| **NIBP Mean** | 79 | | | 81 |
| **Blood Glucose Blood Glucose (mg/dL)** | | | 119 | |
| **Pain Scale Score (/10) Pain Scale Score (/10)** | 0 | | | |
| **PAIN Sed Scale (RASS) Richmond Agitation Sedation Scale (RASS)** | ( 0 ) Alert and Calm | | | |

<u>Progress Note:</u>
**Progress Note:**
55 yo male with EtOH cirrhosis (MELD 33) complicated by recurrent ascites with hx of SBP, EV, and HE. CKD with recurrent AKIs, and anemia, recently admitted for concern for confusion and ARF on CKD and discharged on 5/22/18 then readmitted 5/23/18 for simultaneous liver-kidney transplant.   Hospital course complicated by post-op fevers/hypotension with concern for sepsis of unclear etiology (now improved), gradually declining LVEF with Cardiology following, and thrombocytopenia (Plat: 28  on 5/31).

–No acute changes to plan today

*Rehab Problems/Plans: #s/p SLKT 5/23 with Hx of CKD4: Cr currently 1.29. Transplant renal ultrasound 5/29/18 overall unremarkable. Donor toxoplasma positive. Donor Hep B core antibody positive. Hx of alcoholic cirrhosis with recurrent ascites, EV, and HE.
--PT/OT
--f/u Transplant Recs

NEURO/MSK
#Impair Cog: Likely in setting of hepatic encephalopathy and possible sepsis that is resolved.
--SLP, improving. O Log 26/30
--Cont VMT



**CONFIDENTIAL**

21182191/149489255

Date of Birth

CONFIDENTIAL

| Admit Date | Discharge Date |
|------------|----------------|



**University Health System**

University Health System

Note Date

---

CV
#HFrEF: TTE 5/25/18 with LVEF 40%, repeat TTE 5/28/18 with LVEF 25-30% with global hypokinesis. Repeat 6/6 with marked improvement EF 45-5-% with mild global hypokinesis.
--f/u Card recs
--atorvastatin

PULM:
#Elevated HCO3 on BMPs with high normal CO2 on VBG. pH 7.4
- May have some underlying obstructive disease, can be followed by PCP with PFTs
- Denies SOB, O2 satuartions >96%

GI:
# S/P Liver Transplant 5/23 with + donor for toxo/Hep B
--Daily Lab LFTs
--Prograf with daily Prograf levels
--Valganaciclovir 450mg daily
--protonix
--Bactrim SS 1 tab q24
--Cellcept 750mh two times a day
--Prednisone 5mg daily

#Bowel Regimen:
--Bowel prophylaxis Doc/senna

RENAL/FEN:
#S/p Kidney transplant 5/23:
--Bactrim SS 1 tab q24
--Cellcept 750mh two times a day
--Prednisone 5mg daily
--Prograf with daily Prograf levels
-Daily BMP
-Monitor I/O, UOP
#FEN
-Mag ox three times a day
-Trend mag

ENDO
-NTD, trend glucose on steroids

HEME/ONC
# Anemia of CKD and ESLD: Received epogen SQ 20,000 units x1 on 5/21/18. S/p 2U pRBCs on 5/24.



21182191/149489255

Date of Birth





University Health System

Admit Date          Discharge Date          Note Date

--CBC stable, trend daily
#Thrombocytopenia: Currently Plat 28 on 5/31. Given 1u plts for count of 17 on 5/27

-holding ASA in setting of low plt counts
#DVT
-Heparin 5K

ID
# Severe esophageal candidiasis: EGD 5/20/18
--Confirm start and end dates with primary team
--Cont Diflucan for 21 day course. **END DATE 6/9. Stopped**

#f/u
--PCP
--Transplant
--Reeves

<u>Rehab Lab Results:</u>
<u>Chemistry Trend:</u>
Jun-12-2018 05:12

| | |
|---|---|
| **Sodium Serum** | ↓ 133 |
| **Potassium Serum** | 5.1 |
| **Chloride Serum** | 96 |
| **Carbon Dioxide Total Serum** | ↑ 31 |
| **Anion Gap** | 6 |
| **Glucose Serum** | ↑ 102 (Interpretation: |

The following guidelines were established by the American
Diabetes Association and placed in effect 03-15-2007:

   FPG < 100 mg/dL = Normal fasting glucose
FPG 100 - 125 mg/dL = Impaired fasting glucose
   FPG >= 126 mg/dL = provisional diagnosis of diabetes

Sulfasalazine or sulfapyridine administration prior to
venipuncture may result in falsely depressed or falsely elevated
results, respectively.)

| | |
|---|---|
| **Blood Urea Nitrogen (BUN) Serum** | ↑ 27 |
| **Creatinine Serum** | 0.84 |
| **Calcium Serum** | 8.7 |

CONFIDENTIAL

21182191/14948925S

 University Health System

**University Health System**

Date of Birth

CONFIDENTIAL

Admit Date                Discharge Date                Note Date

| | |
|---|---|
| **Protein Total Serum** | ↓ 5.4 |
| **Albumin Serum** | ↓ 2.5 |
| **Bilirubin Total Serum** | 0.4 |
| **Alkaline Phosphatase** | 85 |
| **Serum** | |
| **AST/SGOT Serum** | 9 (Interpretation: Sulfasalazine or sulfapyridine administration prior to venipuncture may result in falsely depressed results.) |
| **ALT/SGPT Serum** | 15 (Interpretation: Sulfasalazine or sulfapyridine administration prior to venipuncture may result in falsely depressed results.) |
| **Magnesium Serum** | ↓ 1.4 |
| **Phosphorus Serum** 05:33 | 4.0 |
| **Glucose POC** | ↑ 119 |
| **Device location** | 6th Fl Rehab |
| **Operator ID** | 29299 |

**Hematology Trend:**
Jun-12-2018 05:12

| | |
|---|---|
| **White Blood Cell Count** | 4.44 |
| **RBC Count** | ↓ 2.68 |
| **Hemoglobin** | ↓ 8.2 |
| **Hematocrit** | ↓ 26.0 |
| **MCV** | ↑ 97.0 |
| **MCH** | 30.6 |
| **MCHC** | 31.5 |
| **RDW** | ↑ 17.0 |
| **Mean Platelet Volume** | 10.3 |
| **Neutrophil Absolute (Automated)** | 3.71 |
| **Platelet Count** | ↓ 101 |
| **Lymphocyte Percent** | 6.8 |
| **Lymphocyte Absolute** | ↓ 0.30 |

CONFIDENTIAL

21182191/149489255

Date of Birth
CONFIDENTIAL

Admit Date                    Discharge Date


**University Health System**

University Health System

Note Date

| | |
|---|---|
| **Monocyte Percent** | 5.4 |
| **Monocyte Absolute** | 0.24 |
| **Neutrophil Absolute Count** | 3.71 |
| **Eosinophil Percent** | 2.3 |
| **Basophil Percent** | 0.7 |
| **Basophil Absolute** | 0.03 |
| **Segmented Neutrophils Percent** | 83.4 |
| **Nucleated RBC Count** | 0.0 |
| **Nucleated RBC (Absolute)** | 0.00 |
| **Eosinophil Absolute** | 0.10 |
| **Immature Granulocytes Absolute** | 0.06 |
| **Immature Granulocytes Percent** | 1.4 |

**Therapeutic Drug Levels Trend:**

Jun-12-2018 05:12

**Prograf (Tacrolimus) Level**   3.8 (Interpretation:
Therapeutic range Prograf/Tacrolimus:

| Stage of Immunotherapy | Kidney | Liver | Heart/Lung |
|---|---|---|---|
| Initiation (ng/mL) | 10-15 | 10-20 | 10-20 |
| Maintenance | 5-10 | 5-10 | 5-10 |
| Minimization | 3-7 | | |

These new therapeutic ranges are established based on
industry recommendations and on correlation with HPLC,
although this testing was performed using chemiluminescence
technology.)

**Faculty Attestation:**

• **Faculty Attestation**   Patient was seen and examined by me with Dr. Vydra
(Rehabilitation Medicine) on 12 JUN 18. the findings as noted
were confirmed, discussed and plans approved. The
morbidities were reviewed, examined and reconsidered today



**CONFIDENTIAL**

**21182191/149489255**

Date of Birth



Admit Date                Discharge Date



**University Health System**

University Health System

Note Date

---

and diagnosed as sufficiently stable to not preclude safe and effective participation in continued aggressive comprehensive inpatient rehabilitation today in order to meet this patient's goals, without any new restrictions required, in order to optimally restore mobility and independent self-care. See Rehabilitation Medicine Resident Progress note this date as well as Team Conference note with treatment plans developed and revised in coordination and discussion with the entire rehabilitation team including the patient. for additional details.

**Electronic Signatures:**

~~Wydra, Darrell G (DO)~~ (Signed Jun-12-2018 10:14)

*Authored: Progress Note*
~~WALSH, NICOLAS (MD)~~ (Signed Jun-12-2018 18:53)
*Authored: Progress Note*
*Co-Signer: Progress Note*

*Last Updated: Jun-12-2018 18:53 by WALSH, NICOLAS (MD)*

**References:**
1.  Data Referenced From "REHAB Resident Progress Note (SFD)" 6/11/2018 7:50 AM

# EXHIBIT B
# PATIENT SB









 **WELLMED**

## Diagnosis Attestation

| | | | | | |
|---|---|---|---|---|---|
| Patient Name | CONFIDENTIAL | Patient DOB | CONFIDENTIAL | | |
| Date of Visit | 4/4/2019 | Provider Name | Shneker MD, Ayham | | |
| Clinic Name | DNG PLATINUM | InscID | 9352784-01 | Ins Eff Start | 20190101 |
| Group Name | USA | Insurance | SH | Ins Term Date | |

---

**ICD's Pending: 5**  ICD's Addressed: 6

---

ICD(s) not addressed in a patient office visit. This may require an office visit.

1) F33.40     MAJOR DEPRESSIVE DISORDER, RECURRENT, IN REMISSION, UNSPECIFIED     ☐ Agree    ☒ Disagree

No evidence to support diagnosis

Location: Physician Notes     Action: Pending     Ref. Date: 11/8/2018

---

2) N18.2     CHRONIC KIDNEY DISEASE, STAGE 2 (MILD)     ☐ Agree    ☒ Disagree

No evidence to support diagnosis

Location: Physician Notes     Action: Pending     Ref. Date: 11/6/2018

---

The following diagnoses are possible based on diagnostic tests and/or various analytics. For each "Agreed" to diagnoses that you find pertinent, please review and document a plan of care on a progress note. For diagnoses that you find do not pertain to your patient, please mark as "Disagree".

3) D47.3     ESSENTIAL (HEMORRHAGIC) THROMBOCYTHEMIA     ☐ Agree    ☒ Disagree

No evidence to support diagnosis

Location: eDataMining     Action: Pending     Ref. Date: 1/1/2019

Reason: Suspect Thrombocythemia (D47.3) due to a recent platelet count of 479.00 on 20-Feb-2019. To diagnose essential thrombocythemia causes of reactive thrombocytosis must be ruled out as well as the presence of other MPDs (e.g., PV, PMF, CML) or myelodysplasia should be excluded

---

4) E11.22     TYPE 2 DIABETES MELLITUS WITH DIABETIC CHRONIC KIDNEY DISEASE     ☐ Agree    ☒ Disagree

No evidence to support diagnosis

Location: eDataMining     Action: Pending     Ref. Date: 1/1/2019

Reason: Suspect Diabetes with Diabetic Chronic Kidney Disease (E11.22) due to multiple claims for Diabetes Uncomplicated and Chronic Kidney Disease. The most recent A1C was 5.40 on 01/03/2019.

---

5) E11.51     TYPE 2 DIABETES MELLITUS WITH DIABETIC PERIPHERAL ANGIOPATHY WITHOUT GANGRENE     ☒ Agree    ☐ Disagree

Location: eDataMining     Action: Pending     Ref. Date: 1/1/2019

Reason: Suspect Diabetes with vascular disease (E11.51) due to a report of diabetes on 01-Mar-2019 from Claim, and a report of I73.9 PERIPHERAL VASCULAR DISEASE UN on 03-Jan-2019 from Claim. The most recent A1C was 5.40 on 01/03/2019.

---

04/08/2019 09:04 AM Signed by ayham shneker, Staff (ayham shneker - Southcross2)

---

**\*\*CONFIDENTIAL HIPAA INFORMATION\*\***

DR5_AGM2
Date Printed 04/08/2019 09:05:49 AM
©WellMed Medical Management 2009 All rights reserved.

 **DATARAP**

Fax to: (877) 211-7277
(AttestationHMPN_ACEe) 701023507
Page 1 of 2

04/08/2019 09:05 AM Submitted by ayham shneker (Southcross2)

**CONFIDENTIAL HIPAA INFORMATION**



DR5_AGM2
Date Printed 04/08/2019 09:05:49 AM
©WellMed Medical Management 2009 All rights reserved.

Fax to: (877) 211-7277
(AttestationHMPN_ACEe) 701023507
Page 2 of  2



CONFIDENTIAL

64 Y old Female, DOB: CONFIDENTIAL
Account Number: 37496
3007 LAKELAND DR, SAN ANTONIO, TX-78222-2427
Home: 210-606-6486
Guarantor: CONFIDENTIAL  Insurance: WELLMED Payer
ID: WELM2
PCP: Ayham Shneker
Appointment Facility: SA Premier Internal Medicine (Wood)

**04/04/2019**                              Progress Note:  Ronald G Beasley, NP

## Current Medications

**Taking**
- Dexilant 60mg capsule 1 cap orally once a day
- ranitidine 150 mg tablet 1 tab(s) orally 2 times a day
- Advair Diskus 250 mcg-50 mcg powder 1 puff(s) inhaled 2 times a day
- Proventil HFA 90 mcg/inh aerosol 2 puff (s) inhaled 4 times a day
- Anoro Ellipta 62.5 mcg-25 mcg/inh powder 1 puff(s) inhaled once a day
- temazepam 30 mg capsule 1 cap(s) orally once a day (at bedtime)
- duloxetine 60 mg delayed release capsule 1 cap(s) orally once a day
- ProAir HFA 90 mcg/inh aerosol 2 puff(s) inhaled twice daily
- Pen Needle ESY-T 30g 5/16 8mm as directed
- mupirocin topical 2% ointment 1 app applied topically at bed time
- Bayer Low Dose 81 mg delayed release tablet 1 tab(s) orally once a day
- Crestor 20 mg tablet 1 tab(s) orally once a day (at bedtime)
- hydrochlorothiazide-losartan 25 mg-100 mg tablet 1 tab(s) orally once a day
- tramadol 50 mg tablet 1 tab(s) orally 3 times a day
- metformin 1000 mg tablet 1 tab(s) orally 2 times a day
- Restoril 30 mg capsule 1 cap(s) orally once a day (at bedtime)
- Peridex 0.12% liquid 15 mL orally 2 times a day
- Mometasone Furoate 50 mcg/inh spray 2 spray(s) intranasally once a day, stop date 05/03/2019
- carvedilol 12.5 mg tablet 1 tab(s) orally 2 times a day
- ferrous sulfate 325 mg tablet 1 tab(s) orally 2 times a day
- One Touch Verio Meter
- amlodipine 10MG tablet 1 tab(s) orally once a day
- Xarelto 20 mg one tab oral once daily
- Cheratussin AC 10 mg-100 mg/5 mL syrup 10 ml orally every 4 hours prn

## Reason for Appointment
1. 3mnth f/u

## History of Present Illness
Interim History:
   Mrs Butler is here today for routne fu currently doing well withotu compleints.
Hyperlipidemia:
   HYPERLIPIDEMIA F/U doing well and without complaints stable tolerating medicines well. LABS pending. MEDICATIONS currently taking: lipitor. MED SIDE EFFECTS tolerating well.
Hypertension:
   HYPERTENSION F/U doing well and without complaints stable controlled. HOME BP CHECKS not checking. MED COMPLIANCE yes. MED SIDE EFFECTS none.
Diabetes Mellitus:
   Diabetes F/U doing well, no complaints compliant with Meds. Home blood sugar monitoring checks every morning. Eye exam done yearly. Foot exam done regularly. Microalbumin ratio not done.

## Vital Signs
Temp 97.8 F, HR 100 min, BP. L Arm 130/72 mm Hg, Wt 277.0 lbs, Ht 62.5 in, BMI 49.85 Index, O2 Sat 92 %
Pain Assesment:8 pain score
Vitals and Medication taken by Jasmine B,MA.

## Examination
General Examination:
   General Appearance: NAD, alert and oriented. Skin: no foot ulcers. HEENT: PERRLA, EOMI, TM's clear and flat bilaterally, Oropharynx clear with MMM. Oral cavity: clear, moist mucus membranes. Neck, Thyroid : supple, no thyromegaly, no lymphadenopathy. Heart: Regular rate and rythm, no murmurs. lungs clear to auscultation bilaterally, no wheezes/rhonchi/rales. Abdomen: Soft, Non-tender, Non-distended. . Extremities no clubbing, no edema.

## Assessments
1. Hyperlipidemia, unspecified - E78.5 (Primary)

Patient: CONFIDENTIAL  DOB: CONFIDENTIAL   Progress Note: Ronald G Beasley, NP   04/04/2019
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

https://txpllcapp.ecwcloud.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounter...   4/8/2019

**Not-Taking**
- Vitamin D3 5000 intl units capsule 1 cap (s) orally once a day
- Levemir FlexPen 100 UNIT/ML solution 21 units subcutaneously in the morning

**Unknown**
- Atrovent HFA CFC free 17 mcg/inh aerosol 2 puff(s) by metered dose inhaler 4 times a day
- Medication List reviewed and reconciled with the patient

## Past Medical History

DM 2.
Asthma.
HTN.
Hyperlipidemia.
Fibromyalgia.
Osteo Arthritis.
CKD2.
Obesity.
CAD following with dr Wu.
Anemia.
GERD.
PVD Dr Wu is cardiologist.
Hypercholesterolemia.
COPD.
Arthritis.
Major depressive disorder, recurrent, in remission, unspecified.

## Surgical History
10 Stents placed in bilateral legs

## Family History
Father: deceased 57 yrs, diagnosed with Cardiopathy
Mother: deceased 79 yrs, Non-insulin dependent diabetes mellitus, Hypertension, Cardiopathy, Ischemic stroke
1 brother(s) , 3 sister(s) . 2 son(s) , 1 daughter (s) .
1 deceased brother.

## Social History
General:
Smoking Are you a: nonsmoker. no Alcohol. no Drug use. Marital Status: Widowed. Children: 3. Occupation: Retired.

## Allergies
N.K.D.A.

## Hospitalization/Major Diagnostic Procedure
shortnes of breath 1-2018
Blood count low 06/2018

## Review of Systems
CONSTITUTIONAL:
  no Chills.
CARDIOLOGY:
  no Chest Pain.
GASTROENTEROLOGY:

2. Essential (primary) hypertension - I10
3. Type 2 diabetes mellitus with hyperglycemia - E11.65
4. Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene - E11.51
5. Iron deficiency anemia secondary to blood loss (chronic) - D50.0
6. Chronic pain syndrome - G89.4
7. Primary insomnia - F51.01

## Treatment
**1. Hyperlipidemia, unspecified**
  LAB: Lipid Panel Non-HDL
Notes: LDL < Check CK, Fasting Lipid q 3 months Monitor for myalgia and medication intolerance.

**2. Essential (primary) hypertension**
  LAB: Comp. Metabolic Panel (14)
Notes: Encouraged low sodium diet and regular exercise. Pt. instructed to call office if home BP regularly > 130/90.

**3. Type 2 diabetes mellitus with hyperglycemia**
  LAB: Hemoglobin A1c
Notes: We did discuss concept of CGM in addtion to A1c monitoing Comprehensive carbohydrate education performed along with treatemtnt for hypoglycemia rules of 15 education material provided.

**4. Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene**
Notes: DM and BP control, CMP/A1C q 3months, ABI yearly to monitor progression and regression as indicated, continue self foot exams at home, podiatry referral as needed, monofilament exam yearly.

**5. Iron deficiency anemia secondary to blood loss (chronic)**
  LAB: Iron and TIBC
  LAB: CBC With Differential/Platelet

**6. Chronic pain syndrome**
Refill tramadol tablet, 50 mg, 1 tab(s), orally, 3 times a day, 270, Refills 0
Refill duloxetine delayed release capsule, 60 mg, 1 cap(s), orally, once a day, 30 day(s), 90, Refills 3

**7. Primary insomnia**
Refill temazepam capsule, 30 mg, 1 cap(s), orally, once a day (at bedtime), 30, Refills 2

## Follow Up
3 Months, prn

Patient: CONFIDENTIAL DOB: Progress Note: Ronald G Beasley, NP    04/04/2019
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

https://txpllcapp.ecwcloud.com/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounter...    4/8/2019

no Abdominal Pain.
ENDOCRINOLOGY:
   no Polyuria. no Polyphagia.
MUSCULOSKELETAL:
   no Muscle spasm. pain yes.

**Electronically signed by Ronald Beasley , FNP on 04/04/2019 at 01:04 PM CDT**

**Sign off status: Completed**

**SA Premier Internal Medicine (Wood)**
**4411 E SOUTHCROSS BLVD**
**SAN ANTONIO, TX 78222-3726**
**Tel: 210-648-9500**
**Fax: 210-648-9504**

Patient: CONFIDENTIAL DOB: CONFIDENTIAL    Progress Note: Ronald G Beasley, NP   04/04/2019

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)